DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Erie County Court of Common Pleas that found appellant guilty of one count of conspiracy to commit aggravated murder. For the reasons that follow, this court affirms the judgment of the trial court.
Appellant sets forth the following assignments of error:
 "I. THE CONVICTION OF THE DEFENDANT-APPELLANT, MR. CURTIS AYERS, FOR CONSPIRACY TO COMMIT AGGRAVATED MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND DENIED DEFENDANT-APPELLANT DUE PROCESS OF LAW UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
 "II. APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY THE ACTS AND OMISSIONS OF HIS ATTORNEY IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1 SECTION 10 OF THE OHIO CONSTITUTION.
 "III. THE TRIAL COURT ERRED WHEN IT SENTENCED THE APPELLANT TO SERVE A TERM OF INCARCERATION OF NINE YEARS ON A FELONY OF THE FIRST DEGREE. THIS SENTENCE IS NEARLY THE MAXIMUM SENTENCE FOR A FIRST DEGREE FELONY."
The undisputed facts that are relevant to the issues raised on appeal are as follows. In 1991, appellant and his wife Roseann were divorced. They were living in Florida at the time with their three minor children. Pursuant to the divorce decree, appellant had custody of the children and their mother had visitation rights. In April 1992, appellant took the children to Sandusky, Ohio, where some of his family resided. In the summer of 1992, appellant, believing his children were being abused by their mother, obtained false identification for his children and himself and took the children to another state to live. Sometime after this, Roseann contacted the Federal Bureau of Investigation in an attempt to find the children.
After approximately six years, appellant and his children returned to Ohio. In July 1998, using their correct identification, appellant set out for the Virgin Islands with the children. As appellant's car was being processed through customs in Puerto Rico, immigration officials discovered that appellant was in violation of a Florida court order and was wanted on a federal fugitive warrant. Immigration officials contacted the FBI and appellant was held in jail. The children were returned to their mother. Appellant was permitted to post bond and, during August and September 1998, he traveled between Florida and Ohio pending the outcome of the Florida case.
On February 11, 1999, in response to allegations that appellant had on two occasions taken steps to hire someone to kill his ex-wife, the Erie County Grand Jury indicted appellant on two counts of conspiracy, alleging that in 1992 and in 1998 appellant, with purpose to commit, promote or facilitate the commission of aggravated murder, had planned or aided in planning the commission of such offense in violation of R.C.2923.01(A) and 2903.01(A)(1). The indictment later was amended to include an allegation that appellant had committed substantial overt acts in furtherance of the conspiracy. On July 27, 1999, the case went to trial before a jury and the following relevant evidence was heard.
FBI Special Agent Charles Halloway, who is assigned to the Sandusky office, testified that he first became aware of appellant in 1992, when he received information from the FBI office in Miami that appellant was wanted on a federal unlawful flight warrant. In September 1998, Halloway was contacted by a man named Joseph Greenwald from Sandusky, who said that he had been approached by appellant about killing appellant's ex-wife. Halloway met with Greenwald to obtain additional information and then arranged for Greenwald to introduce appellant to an undercover FBI agent posing as a hit-man on October 4, 1998 in Sandusky.
FBI Special Agent Gregory Cox testified that he volunteered to work undercover and pose as someone willing to be hired to commit murder. Cox testified that the plan called for him to be introduced to appellant by Joe Greenwald and for Greenwald to then step out of the scenario and let Cox take over. Cox testified further that on October 4, 1998, shortly before 2:00 p.m., Greenwald introduced appellant to him at the downtown pier in Sandusky. Cox stated that the car in which he was sitting was set up with video and audio recording equipment. Cox testified that he and appellant sat in the car and talked for a little over one hour, during which time appellant indicated that he was looking for someone he could hire to murder his ex-wife so that he could gain custody of his children. Cox described appellant as initially very cautious and "almost arrogant." He stated that appellant asked him if he was a law enforcement officer and said he assured appellant he was not. He testified that after that point, appellant became very open and provided detailed information as to how he wanted the murder accomplished. Cox further stated that appellant was very arrogant and not intimidated by Cox at all and that appellant controlled the conversation. The videotape of the conversation between appellant and Cox was then played for the jury.
The videotape begins with Greenwald introducing appellant to Cox. Greenwald then left the scene and appellant got into the front passenger seat of Cox's car. Cox then stated, "So you're the guy that's got problems, huh?" and, when appellant responded yes, Cox said, "So what's happening? He didn't tell me much." Appellant then talked at length and in much detail about his problems with his ex-wife, how he believed she was abusing their three children and how he took the children to another state, where they lived under fictitious names from 1992 until 1998. Cox told appellant that he would "do whatever you want to * * *." Appellant stated that he had told Greenwald it was "a little bit premature for him to set up a meeting, to be honest with you, because I don't have the funds yet." Referring to his arrest in Puerto Rico and the resulting detention, appellant explained that he was "still waiting for it to get released. They took possession of everything down to my socks and my underwear." Cox stated, "What are we talking about, I mean, what are we talking about, how much money?" Appellant responded, "What I was looking at was probably about six, something like that." Cox asked, "You want me to get rid of her; is that right?" and appellant nodded. Cox then asked appellant what he wanted him to do to her and the two men discussed Roseann's living situation and how she works out of her home. Appellant told Cox that he has "a video of her, you'll be able to see her face, they got license plate numbers down. * * * Car types, all of that kind of stuff."
Cox then asked appellant, "What do you want it to look like * * *?" Appellant did not answer that question immediately but talked again about how the meeting was a little bit premature because he did not yet have the funds. Appellant then said, "What I'm going to say now is straight up, it's drastic * * *" and said that he wanted his children to be safe. He then stated, "The only other thing that bothers me is if I were to do something, they are coming to me first. * * * There is no 100 percent alibi then. * * * No matter how good it's done, there's no hundred percent alibi, they are to come and harass me. I'm going to be sitting right * * * * * down in another * * * * state when this happens the way we figured it." He continued, "I'm in Florida * * * I'll be picking up my shit at the FBI office when this happens. What better alibi, right?" During another discussion about money, appellant told Cox, "* * * one way or the other, you're going to get money, one way or another." Cox told appellant he would write down his pager or phone number and appellant could call him and appellant said okay. Appellant then stated: "This is what I think would be the right way because of the fact is this: If it's a mob style hit, they are going to say I was involved, period, you know that, right? * * * Okay, I've got to make it look as if it was something that just shit happens. * * * Now the best bet for me what I was thinking is if it's a carjacking, it happens every fucking day. * * * She's got a brand fucking new automobile. She gets fucking killed and she gets — you know, and the car goes away." Appellant further discussed the carjacking scenario and discussed whether to get rid of her car by taking it to a "chop shop" or by leaving it in a high-crime neighborhood with the keys in it so that someone would find it, drive it around and possibly get arrested and told "You did it."
Appellant then gave Cox Roseann's address along with directions to her house. He told Cox Roseann's morning schedule for dropping off the three children at their schools and discussed the location of the last school on the route. Appellant told Cox to "be prepared" because Roseann probably carries a gun in her purse. Appellant then said "the gun situation needs to be a clean something * * *." The conversation turned toward disposal of the body and appellant told Cox he would "leave that up to you." Appellant then said, "What I was thinking was that, one of the things that was thought of was just disappear, vehicle, car, body, everything * * *." Appellant discussed the merits of the carjacking scenario as well as "driving someplace out in the woods or throwing her into a cornfield." He added: "They wouldn't find her for a while, but they would find her, and the car is gone, and they would revert back to the carjacking." As to payment, Cox told appellant he wanted some money to show "good faith" and appellant said, "Sure, no problem. * * * You'll get paid one way or the other." Appellant and Cox then discussed the need for a plan for appellant to get the remainder of the payment to Cox without the two men actually having contact with each other. Appellant said that "before this goes down, we'll figure out a strategic place for me to leave an envelope." Appellant commented, "We have got a license plate number, we have got the car type, we have got the address of the house, we have got video of her, and — I guess, anything else you can think of that you would need?" When Cox stated that he would "shoot the bitch in the head," appellant laughed. Appellant then directed Cox to Roseann's neighborhood and they drove past her house. Appellant pointed out the house. They continued driving and appellant wrote down the pager number Cox gave him. They discussed an initial payment of $1,000 and appellant said, "I'll get you the thousand, I'll get you the tape, and I'll get you the address and all of that stuff." As appellant got out of the car, Cox stated, "Okay, I'll take care of her for you," and appellant responded, "Appreciate it, man."
After the tape was played, Cox identified appellant as the man shown in the videotape.
The state then presented the testimony of Joseph Greenwald, Sr., who stated that his brother-in-law introduced him to appellant in the summer of 1998. Greenwald stated that after the two men were introduced, they began talking and appellant told him that his ex-wife was abusing their children and that he wanted Greenwald to kill her. Greenwald testified that he did not think appellant was serious. He stated that he and appellant talked later and appellant offered him $6,000 to kill his ex-wife and make it look like a drive-by shooting or a carjacking. Greenwald described a third conversation during which appellant told him where Roseann lived. He further testified that appellant went to Florida and called him approximately three times. He testified that he had told appellant that he did not want to kill his ex-wife but that he would find someone else to do it. Greenwald stated that he finally contacted the FBI in September when he realized appellant was serious. He further testified that his role in this case ended when he introduced appellant to Cox. Greenwald stated that during his adult life he has spent a total of fifteen years in jail or in various institutions but that he had stayed out of trouble for the previous five years. Denise Greenwald, Joseph Greenwald's wife, testified that when she became aware that her husband had been approached by appellant to commit the murder, she told her husband that she would leave him if he did not report appellant to the police.
Joseph Greenwald, Jr., testified that in August 1998, appellant approached him and offered him $6,000 to kill his ex-wife. Joseph testified that he declined and that appellant approached him several more times. He further testified that appellant approached a lot of people and everyone turned him down. Joseph stated that appellant told him that he had previously paid someone $10,000 to kill his wife but that person took the money and never followed through.
Lucas Greenwald, brother of Joseph Greenwald, Sr., testified that appellant approached him on two separate occasions during the summer of 1998, and asked him to kill his ex-wife. Lucas did not respond to appellant either time. Daniel Jackson testified that in 1992, Curtis Eugene Ayers paid him $10,000 to kill his ex-wife and that he kept the money but did not commit the murder. Jackson was unable to identify appellant as Curtis Eugene Ayers.
The state rested its case and the defense presented the following witnesses. Sandra Statton, appellant's half-sister, testified that the FBI approached her twice in 1992, and asked her if she knew where her brother was. Statton said she told them she did not know where he was. Curtis Ayers, Sr., appellant's father, and Mary Ayers, appellant's mother, both testified that they had been approached by FBI agents in 1992, asking if they knew of appellant's whereabouts. Gary Conradi, brother of Joseph Greenwald, Sr., testified that Greenwald had approached him in 1998, and told him that the two of them could make some money by killing appellant's ex-wife but testified further that he was not interested.
Appellant then testified on his own behalf. He testified at length as to how and why he believed his ex-wife was abusing their children and as to the events leading up to his decision to take the children to another state under false identities. Appellant testified that he gave Dan Jackson $5,000 in 1992, to obtain false identifications for his children and him but that Jackson kept the money and did not follow through with the documents. Appellant further testified that he gave Jackson an additional $5,000 so that he could make repairs on his house. Appellant testified as to moving to another state with the children where they stayed for six years. Appellant discussed his decision in 1998 that he would move with his children to the Virgin Islands temporarily and then eventually back to Ohio so that they could all resume their true identities. He testified that on the way to the Virgin Islands in July 1998, he was arrested in Puerto Rico on a charge of "removal/concealment of minors."
Appellant testified that he was released on bond and traveled between Florida and Ohio for the next several months. He stated that during that time, Joe Greenwald, Sr. tried many times to get him to meet with a hit man but that appellant refused. Appellant described pressure he had received from other family members to agree to a plan to kill his ex-wife and stated that he continually told those people that he did not want to do it.
Appellant denied ever conspiring with Dan Jackson to have his ex-wife killed. He stated that when he returned to Sandusky from Florida on October 3, 1998, Joe Greenwald, Sr. told him that there was someone he wanted appellant to meet.
Appellant testified at length as to his belief that the FBI hated him, was constantly following him, and probably would try to kill him. Appellant testified that he was trying to think of ways to get the FBI to stop harassing him and said that he had frequented an establishment known as "Spy Headquarters" in an effort to acquire sophisticated recording equipment so that he could film the FBI filming him and then try to get it on "60 Minutes."
Appellant further testified that on October 4, 1998, he received a call from Greenwald again trying to coerce him into meeting with a friend. Appellant decided that he would go and "see what's going on with this * * * to try to put an end to [the] nonsense." He stated that he wanted to force the FBI to get out of his life. Appellant went to Greenwald's house and Greenwald received a call arranging a meeting place. Appellant further testified that he suspected it was a set-up by the FBI. He stated that when he went to the designated meeting spot with Greenwald he saw "a lot of agents." He described the various agents he saw and stated that when he was looking all around while he was in the car with Agent Cox he was actually watching the many agents who were out in the open. Appellant stated that he knew where the camera was hidden in the car and that he knew it was a "sting operation." Appellant further testified that he had learned from reading some criminal law in college that if an individual asks the person he is with if he is a police officer, anything the individual says after that point cannot be used against him if it turns out that the other person is a police officer. Appellant testified that as he sat in the car he was thinking that if he got out they might shoot him. He was also thinking that he should "try to feel them out, mess with them a little bit * * *." He looked at the situation as a chance to speak and say "Ha, ha, you guys couldn't get me for all those years." When questioned about having discussed possible ways to kill his ex-wife, appellant stated that he participated in that discussion so that they would think they had him "in their little hook" and so that he could get out of the car without getting shot. Appellant testified that he never paid Cox and that he ripped up the pager number when he returned to Florida. Appellant stressed that he never gave Cox a photo of Roseann or a copy of the videotape of her and that they never agreed on a set plan for how and when the murder should take place. Appellant further stated that telling Cox that the meeting was premature was his way of putting it off in the event that the meeting was being recorded.
Appellant's brother, Randall Ayers, testified that he visited with appellant the weekend of the meeting with Cox and that appellant was shaken, fearful and afraid of his situation, including the FBI. Randall stated that Joe Greenwald was constantly pressuring his brother that weekend to meet with his friend and further testified that his brother only agreed to the meeting in order to see what was going on.
Appellant's ex-wife, Roseann Tomei, testified on rebuttal as to the circumstances surrounding her divorce from appellant and the disappearance of appellant and the children in 1992.
On July 30, 1999, the jury returned verdicts of not guilty as to count one, the alleged conspiracy with Dan Jackson in 1992, and guilty as to count two, conspiracy to commit aggravated murder in 1998. It is from that judgment that appellant appeals.
In his first assignment of error, appellant asserts that his conviction is against the weight of the evidence. Appellant argues that there is no direct evidence that he and Agent Cox formulated a plan to commit murder and that all that occurred between the two men was a "conversation." Appellant asserts that the "conversation" that took place between Agent Cox and himself can only be classified as a "preliminary meeting" and that he was merely talking and trying to act tough. Appellant further argues that he did not commit a substantial overt act toward the commission of the crime of murder.
Weight of the evidence indicates that the greater amount of credible evidence supports one side of an issue more than the other. State v.Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594. The Ohio Supreme Court has defined the standard applied to determine whether a criminal conviction is against the manifest weight of the evidence:
 "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 388, citing Tibbs v. Florida (1982), 457 U.S. 21, 42.
To determine whether this is an exceptional case where the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175. Only if we conclude that the trier of fact clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial. Id.
R.C. 2923.01 defines conspiracy, in relevant part, as follows:
 "(A) No person, with purpose to commit or to promote or facilitate the commission of aggravated murder * * * shall do either of the following:
 "(1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;
 "(2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.
 "(B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed. * * *"
"* * * [T]he phrase `overt act' means an open act, done outwardly, without attempt at concealment, and performed pursuant to and manifesting a specific intent or design." State v. Papp (1980), 68 Ohio App.2d 21, paragraph one of the syllabus. The sixty-minute videotape of the meeting between appellant and Agent Cox showed such "overt acts" as appellant discussing with Cox how much he would pay for the murder, how and where the murder should take place, and how Cox should dispose of the body. This discussion clearly manifested a specific intent or design. SeePapp, supra. Further, the videotape shows that appellant had Cox drive past Roseann's house.
We have thoroughly reviewed the evidence in this case and find no indication that the trier of fact lost its way in resolving conflicts in the evidence or that it created a manifest miscarriage of justice by finding appellant guilty of conspiracy to commit aggravated murder. Accordingly, we find that appellant's conviction was not against the weight of the evidence and appellant's first assignment of error is not well-taken.
In his second assignment of error, appellant asserts that he received ineffective assistance of trial counsel. Appellant claims that counsel failed to properly prepare for trial, had to be told by the trial court and the prosecutor how to proceed during voir dire, should have requested a detailed jury instruction on the definition of "substantial overt act," and conducted himself inappropriately due to his inability to hear well.
To prevail on a claim of ineffective assistance of counsel, appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. This standard requires appellant to satisfy a two-part test. First, appellant must show that counsel's representation fell below an objective standard of reasonableness. Second, appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different when considering the totality of the evidence that was before the court.Strickland v. Washington (1984), 466 U.S. 668. This test is applied in the context of Ohio law that states that a properly licensed attorney is presumed competent. State v. Hamblin (1988), 37 Ohio St.3d 153.
We find that appellant has not presented any evidence in support of his claim that trial counsel failed to properly prepare for trial. Appellant also has not shown that trial counsel's hearing impairment caused his representation to fall below an objective standard of reasonableness. Appellant further asserts that trial counsel should have requested a detailed jury instruction as to the definition of a "substantial overt act." We find, however, that the trial court instructed the jury as to the definition of a substantial overt act and that appellant therefore was not prejudiced by trial counsel's failure to request such an instruction. Appellant also claims that he was prejudiced by trial counsel's inaccurate statement during closing argument as to the law concerning entrapment. The record shows, however, that counsel's misstatement was quickly corrected.
Finally, appellant asserts that trial counsel had to be told by the trial court and the prosecutor how to proceed during voir dire. Appellant further asserts that the jury was selected by the prosecutor because defense counsel did not ask any of the potential jurors specific questions. Appellant argues that trial counsel lectured potential jurors about the law and had to be instructed by the court to ask specific questions rather than discuss the law.
It is clear from the record that trial counsel asked relatively few specific questions of the potential jurors compared to the number of questions asked by the prosecutor. It appears that trial counsel did tend to ramble on and lecture on the law as opposed to asking direct questions of individual potential jurors. Defense counsel's voir dire, however, does not have to take a particular form, nor do specific questions have to be asked. State v. Evans (1992), 63 Ohio St.3d 231,246; see, also, State v. Dennis (1997), 79 Ohio St.3d 421, 436. We decline to substitute our judgment for that of the trial court in this instance and we hold that trial counsel was not deficient in his voir dire.
Based on the foregoing, we see no basis for holding that appellant was prejudiced by trial counsel's performance. Appellant has not established that trial counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Accordingly, appellant's second assignment of error is not well-taken.
In his third assignment of error, appellant asserts that the trial court erred by imposing a sentence of nine years, which is one year less than the maximum allowable sentence for conspiracy to commit aggravated murder. Appellant cites R.C. 2929.14(B), which requires a trial court to impose a minimum sentence for first-time imprisonment unless it specifies on the record that the shortest prison term will demean the seriousness of the conduct or will not adequately protect the public from future crime by the offender. This statute applies to appellant because he had no prior criminal record.
R.C. 2929.14(B) reads as follows:
 "If the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender and if the offender previously has not served a prison term, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section, unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." [Emphasis added.]
The Supreme Court of Ohio considered the scope of the statutory phrase "finds on the record" in State v. Edmonson (1999), 86 Ohio St.3d 324, after the issue was certified to that court for review and final determination. The Supreme Court construed the statute to mean that "* * * unless a court imposes the shortest term authorized on a felony offender who has never served a prison term, the record of the sentencing hearing must reflect that the court found that either or both of the two statutorily sanctioned reasons for exceeding the minimum term warranted the longer sentence." Id. at 326. Edmonson determined that, in contrast to other sentencing statutes that require a trial court to specify its reasons for selecting the sentence imposed, R.C. 2929.14(B) does not require that the trial court give its reasons for finding that either of the two factors exist before it can lawfully impose more than the minimum authorized sentence. The court concluded that "the verb `finds' as used in this statute means that the court must note that it engaged in the analysis and that it varied from the minimum for at least one of the two sanctioned reasons." Id.
Accordingly, this court must determine whether the trial court in this case specified on the record that one or both of the reasons allowed by R.C. 2929.14(B) justified a sentence longer than the minimum. The record shows that prior to imposing sentence the trial court stated:
 "Now, as Mr. Baxter has indicated, the law provides that there is a presumption of prison in this case and that the Court is obligated to weigh the various factors in the statute to make that final determination.
"* * *
 "So considering all the evidence that the Court has heard, the jury's findings, the very seriousness of this case, the fact that the Court feels that the public also has a right to be protected from any future crime * * * the Court feels that the community sanctions is not an appropriate remedy." [Emphasis added.]
Upon consideration of the foregoing, we find that the trial court based its sentencing decision on a finding that the minimum sentence would not adequately protect the public from future crime by appellant or others. Accordingly, appellant's sentence is not contrary to law and appellant's third assignment of error is not well-taken.
On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Erie County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
Melvin L. Resnick, J., George M. Glasser, J. CONCUR.
 _______________________ Richard W. Knepper, J.
JUDGE
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.